IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division



FILED

FEB 6 2013

CLERK. US DISTRICT COURT
NORFOLK. VA

---

| | |
|---|---|
| AARON MASTERSON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>vs.<br><br>COMMONWEALTH BANKSHARES, EDWARD J. WOODARD, JR., CYNTHIA A. SABOL, STEPHEN G. FIELDS, SIMON HOUNSLOW, TROY BRANDON WOODARD, CHRIS E. BEISEL, MORTON GOLDMEIER, E. CARLTON BOWYER, Ph.D., THOMAS W. MOSS JR., HERBERT PERLIN, KENNETH YOUNG, AND WILLIAM D. PAYNE,<br><br>Defendants. | CASE NO.: 2:13cv62<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

---

Plaintiff Aaron Masterson, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Commonwealth Bankshares, Inc. ("Commonwealth" or the "Company"), securities analysts' reports and advisories about the

1

Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased common stock of Commonwealth during the period between May 9, 2008 and September 23, 2011, inclusive. Plaintiff seeks to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Commonwealth is a bank holding company that primarily conducted its business through Bank of the Commonwealth operating subsidiary (the "Bank").

3.      Throughout the Class Period, defendants concealed the Company's and Bank's true financial condition in a number of ways, including by, among other things, fraudulently underreporting the Company's allowance for loan and lease losses ("ALLL") and provision for loan and lease losses (the "Provision"), in an effort to overstate the quality and nature of the Bank's loan portfolio.

4.      The fraud became unsustainable, and ultimately on September 23, 2011, the Virginia State Corporation Commission closed the Bank and appointed the FDIC as receiver.

5.      As the market learned the truth of the Company's and Bank's true financial conditions, the value of the Company's stock dramatically fell and has since become nearly worthless.

2

6.     The market began to learn of the fraudulent intent underlying Commonwealth's false statements on or after December 20, 2012, when an indictment was unsealed accusing certain of Commonwealth's officers and directors of bank fraud.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

8.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. § 1331.

9.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the NASDAQ ("NASDAQ").

## PARTIES

11.     Plaintiff Aaron Masterson, as set forth in the attached PSLRA certification, purchased Commonwealth securities at artificially inflated prices during the Class Period and has been damaged thereby.

12.     Defendant Commonwealth is a Virginia corporation with its principal place of business in Norfolk, VA. During the Class Period, Commonwealth's common stock was listed on the NASDAQ.

3

13.     Defendant Edward J. Woodard, Jr. ("Woodard"), from 1987 through December 31, 2010, was the Chairman, President, and CEO of Commonwealth. Woodard remained a Director of Commonwealth following his retirement on December 31, 2010.

14.     Defendant Cynthia A. Sabol ("Sabol"), from February 2004 through September 23, 2011, was Executive Vice President, CFO, Secretary, and Principal Accounting Officer of Commonwealth.

15.     Defendant Stephen G. Fields ("Fields"), from December 2004 through December 9, 2010, was Commonwealth's Executive Vice President and Commercial Loan Officer.

16.     Defendant Simon Hounslow ("Hounslow") at all relevant times herein was Commonwealth's Executive Vice President and the Bank's Chief Lending Officer.

17.     Defendant Troy Brandon Woodard ("T. Woodard") at all relevant times herein was a Vice President and Mortgage Loan Specialist until his termination in January 2011. T. Woodard is Woodard's son.

18.     Defendant Chris E. Beisel ("Beisel") served as Executive Vice President and Chief Credit Officer of the Company from March 2010 until December 31, 2010. On December 21, 2010, Beisel was appointed as the Company's interim President and identified as the Company's Principal Executive Officer.

19.     Defendant Morton Goldmeier ("Goldmeier"), during the Class Period, was Director of the Company and served as Chairman of the Company's Audit Committee.

20.     Defendant E. Carlton Bowyer ("Bowyer") was a Director of the Company and a member of the Company's Audit Committee.

4

21.     Defendant Thomas W. Moss, Jr. ("Moss") was a Director of the Company and a member of the Company's Audit Committee.

22.     Defendant Herbert Perlin ("Perlin") was a Director of the Company and a member of the Company's Audit Committee.

23.     Defendant Kenneth J. Young ("Young") was a Director of the Company and a member of the Company's Audit Committee.

24.     Defendant William D. Payne ("Payne") was a Director of the Company and a member of the Company's Audit Committee.

25.     Collectively, defendants Woodard, Sabol, Fields, Hounslow, T. Woodard, and Beisel are referred to hereinafter as the "Individual Defendants."

26.     Collectively, Goldmeier, Bowyer, Moss, Perlin, Young, and Payne are referred to hereinafter as the "Audit Committee Defendants."

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased common stock of Commonwealth during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

28.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time, and

5

can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by Commonwealth or its transfer agent, and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

29.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

30.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

31.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

> (a) whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
> (b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Commonwealth; and
>
> (c) to what extent the members of the Class have sustained damages, and the proper measure of damages.

32.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

33.     The Class Period begins on May 9, 2008 when the Company filed a materially false and misleading Form 10-Q with the SEC for first quarter ended March 31, 2008. The 10-Q was signed by defendants Woodard and Sabol.

34.     Accompanying the 10-Q were separately signed Sarbanes-Oxley ("SOX") certifications by Woodard and Sabol falsely attesting: (a) to the accuracy of the Company's financial statements; and (b) that any fraud, whether or not material, was disclosed.

35.     On August 11, 2008, the Company filed a materially false and misleading 10-Q with the SEC for the second quarter ended June 30, 2008. The 10-Q was signed by defendants Woodard and Sabol. Accompanying the 10-Q were separately signed SOX certifications by Woodard and Sabol falsely attesting: (a) to the accuracy of the Company's financial statements; and (b) that any fraud, whether or not material, was disclosed.

36.     On November 10, 2008, the Company filed a materially false and misleading 10-Q with the SEC for the third quarter ended September 30, 2008. The 10-Q was signed by defendants Woodard and Sabol. Accompanying the 10-Q were separately signed SOX certifications by Woodard and Sabol falsely attesting: (a) to the accuracy of the Company's financial statements; and (b) that any fraud, whether or not material, was disclosed.

37.     On March 16, 2009, the Company filed a materially false and misleading 10-K with the SEC for the fiscal year ended December 31, 2008. The 10-K was signed by defendants Woodard, Sabol, Bowyer, Goldmeier, Moss, Payne, Perlin, and Young.  Accompanying the 10-K were

7

separately signed SOX certifications by Woodard and Sabol falsely attesting: (a) to the accuracy of the Company's financial statements; and (b) that any fraud, whether or not material, was disclosed.

38.    On May 11, 2009, the Company filed a materially false and misleading 10-Q with the SEC for the first quarter ended March 31, 2009. The 10-Q was signed by defendants Woodard and Sabol. Accompanying the 10-Q were separately signed SOX certifications by Woodard and Sabol falsely attesting: (a) to the accuracy of the Company's financial statements; and (b) that any fraud, whether or not material, was disclosed.

39.    On August 10, 2009, the Company filed a materially false and misleading 10-Q with the SEC for the second quarter ended June 30, 2009. The 10-Q was signed by defendants Woodard and Sabol. Accompanying the 10-Q were separately signed SOX certifications by Woodard and Sabol falsely attesting: (a) to the accuracy of the Company's financial statements; and (b) that any fraud, whether or not material, was disclosed.

40.    On November 9, 2009, the Company filed a materially false and misleading 10-Q with the SEC for the third quarter ended September 30, 2009. The 10-Q was signed by defendants Woodard and Sabol. Accompanying the 10-Q were separately signed SOX certifications by Woodard and Sabol falsely attesting: (a) to the accuracy of the Company's financial statements; and (b) that any fraud, whether or not material, was disclosed.

41.    On March 31, 2010, the Company filed a materially false and misleading 10-K with the SEC for the fiscal year ended December 31, 2009. The 10-K was signed by defendants Woodard, Sabol, Bowyer, Goldmeier, Moss, Payne, Perlin, and Young. Accompanying the 10-K were separately signed SOX certifications by Woodard and Sabol falsely attesting: (a) to the accuracy of the Company's financial statements; and (b) that any fraud, whether or not material, was disclosed.

8

42.     On May 17, 2010, the Company filed a materially false and misleading 10-Q with the SEC for the first quarter ended March 31, 2010. The 10-Q was signed by defendants Woodard and Sabol. Accompanying the 10-Q were separately signed SOX certifications by Woodard and Sabol falsely attesting: (a) to the accuracy of the Company's financial statements; and (b) that any fraud, whether or not material, was disclosed.

43.     On August 16, 2010, the Company filed a materially false and misleading 10-Q with the SEC for the second quarter ended June 30, 2010. The 10-Q was signed by defendants Woodard and Sabol. Accompanying the 10-Q were separately signed SOX certifications by Woodard and Sabol falsely attesting: (a) to the accuracy of the Company's financial statements; and (b) that any fraud, whether or not material, was disclosed.

44.     On November 15, 2010, the Company filed a materially false and misleading 10-Q with the SEC for the third quarter ended September 30, 2010. The 10-Q was signed by defendants Woodard and Sabol. Accompanying the 10-Q were separately signed SOX certifications by Woodard and Sabol falsely attesting: (a) to the accuracy of the Company's financial statements; and (b) that any fraud, whether or not material, was disclosed.

45.     On April 15, 2011, the Company filed a materially false and misleading 10-K with the SEC for the fiscal year ended December 31, 2010. The 10-K was signed by defendants Beisel, Sabol, Moss, Perlin, and Young. Accompanying the 10-K were separately signed SOX certifications by Beisel and Sabol falsely attesting: (a) to the accuracy of the Company's financial statements; and (b) that any fraud, whether or not material, was disclosed.

46.     On May 16, 2011, the Company filed a materially false and misleading 10-Q with the SEC for the first quarter ended March 31, 2011. The 10-Q was signed by defendants Beisel and

Sabol. Accompanying the 10-Q were separately signed SOX certifications by Beisel and Sabol falsely attesting: (a) to the accuracy of the Company's financial statements; and (b) that any fraud, whether or not material, was disclosed.

47.     On August 15, 2011, the Company filed a materially false and misleading 10-Q with the SEC for the second quarter ended June 30, 2011. The 10-Q was signed by defendants Beisel and Sabol. Accompanying the 10-Q were separately signed SOX certifications by Beisel and Sabol falsely attesting: (a) to the accuracy of the Company's financial statements; and (b) that any fraud, whether or not material, was disclosed.

## THE TRUTH BEGINS TO MATERIALIZE AND EMERGE

48.     Throughout the Class Period, the truth of the Company's true financial condition emerged through partial disclosures. Although the Company announced increases in ALLL and the Provision over time through partial disclosures, it fraudulently attempted to do so with a "soft landing" by failing to increase ALLL and the Provision to the full extent required, and at the same time issuing false reassurances to investors.

49.     On November 4, 2009, the Company issued a press release announcing its third quarter results for 2009. The press release revealed that the Company had to increase its ALLL and Provision, but the Company failed to increase its ALLL and Provision to the full extent required. The press release touted that the increase in ALLL was "prudent" and the Bank's "strong capital position" would allow it to weather the economic storm.

50.     The November 4, 2009 announcement caused the Company's stock to fall $.41/share or 9.2% on November 5, 2009.

10

51.     On January 29, 2010, the Company announced that it had to restate its third quarter results for 2009 as the Company's ALLL and Provision had to be restated. Although this announcement revealed increases in ALLL and the Provision, the Company continued to mask the Bank's true financial condition as it failed to report all the necessary increases to ALLL and the Provision.

52.     This announcement caused the Company's stock to fall $.12/share or 6.5% on February 1, 2010.

53.     On May 14, 2010, the Company issued a press release announcing its second quarter 2010 results. In the press release, the Company stated it had to increase its ALLL, but the Company failed to list all the necessary increases in ALLL that it was required to take for the second quarter. The Company continued to falsely reassure investors that it was committed to taking all necessary actions. This announcement caused the Company's stock to fall $.38/share or over 10% on May 17, 2010.

54.     On January 29, 2010, Commonwealth announced that it intended to restate its ALLL for the third quarter ended September 30, 2009. Although Commonwealth noted the restatement would result in an increase in ALLL from $41 million to $64 million, the Company continued to mask and conceal the full extent of the deterioration of its loan portfolio and continued to under-report the Company's ALLL and Provision.

55.     The January 29, 2010 press release caused the Company's stock to fall $.12/share or over 6% on February 1, 2010.

56.     On November 15, 2010, the Company filed its second quarter 10-Q for 2010 with the SEC. Although the 10-Q revealed increases in the Company's non-performing loans, the Company

11

continued to conceal the full extent of its non-performing loans. This announcement caused the Company's stock to fall $.42/share or 17.7%.

57.     On April 15, 2011, the Company filed its 10-K for the fiscal year ended December 31, 2010. The 10-K revealed that "[a] federal grand jury is investigating the Bank and certain former and current officers and directors regarding lending and reporting practices of the Bank and the manner in which certain loans and loan renewals were considered and approved. In addition, the grand jury is investigating the personal interests of several of these individuals involving certain Bank transactions."

58.     This announcement caused the Company's stock to fall $.23/share or 31.5% on April 18, 2011.

59.     On August 15, 2011, the Company issued a press release announcing continued deterioration in the Company's loan portfolio and increases in ALLL and the Provision for the second quarter ended June 30, 2011. The announcement also revealed the Company had engaged investment banking firms to consider strategic alternatives. Although the Company acknowledged increases in ALLL and the Provision, the Company did not come clean with the true extent of the Bank's problems.

60.     This announcement caused the Company's stock to fall $.14/share or 45% on August 16, 2011.

61.     On September 23, 2011 the Virginia State Corporation Commission Bureau of Financial Institutions closed the Bank and appointed the FDIC as receiver. This caused the Company's stock to fall $.06/share or nearly 55% on September 26, 2011.

12

62.     On December 20, 2012, an indictment was unsealed in the matter entitled, *United States of America v. Edward J. Woodard, et al.*, No. 2:12cr105 (E.D. Va.). The indictment charged defendants Woodard, Hounslow, Fields, and T. Woodard ("Bank Insiders") with conspiracy to commit bank fraud and related crimes. The indictment is incorporated herein by reference as if fully set forth herein.

63.     According to the indictment, the purpose of the bank fraud conspiracy was "for Bank [I]nsiders to fraudulently conceal the Bank's true financial condition in many ways, including overdrawing demand deposit accounts to make loan payments, extending new loans or additional principal on existing loans to cover payment shortfalls, and funneling Bank-owned property to certain troubled borrowers, to the detriment of the Bank.

64.     On January 13, 2013, the SEC filed a civil enforcement action against defendants Woodard, Sabol and Fields for fraudulently misstating the Company's ALLL in filings made with the SEC between November 2008 and August 2010. The complaint styled as *United States Securities and Exchange Commission v. Edward J. Woodard, Jr., et al.*, No. 2:13CV 16 (E.D. Va.), is incorporated herein by reference as if fully set forth herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

65.     At all relevant times, the market for Commonwealth common stock was an efficient market for the following reasons, among others:

(a)     The Company's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

13

(b)     During the class period, on average, over hundreds of thousands of shares of Commonwealth stock were traded on a weekly basis, demonstrating a very active and broad market for the Company's stock and permitting a very strong presumption of an efficient market;

(c)     Commonwealth regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)     Commonwealth was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(e)     Numerous NASD member firms were active market-makers in Commonwealth stock at all times during the Class Period; and

(f)     Unexpected material news about Commonwealth was rapidly reflected and incorporated into the Company's stock price during the Class Period.

66.     As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding Commonwealth from all publicly available sources and reflected such information in Commonwealth's stock price. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of Commonwealth's common stock at artificially inflated prices, and a presumption of reliance applies.

14

## FIRST CLAIM
### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against Commonwealth, Woodard, Sabol, and Beisel

67.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

68.     This claim is asserted against Commonwealth, Woodard, Sabol, and Beisel (the "First Claim Defendants").

69.     During the Class Period, First Claim Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Commonwealth securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, First Claim Defendants, and each of them, took the actions set forth herein.

70.     First Claim Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Commonwealth securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. All First Claim Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

71.     First Claim Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Commonwealth as specified herein.

72.     These First Claim Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Commonwealth's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Commonwealth and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Commonwealth's securities during the Class Period.

73.     Each of the individual First Claim Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and

16

sales at all relevant times; and (4) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

74. First Claim Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such First Claim Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Commonwealth's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by First Claim Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, First Claim Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

75. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Commonwealth's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Commonwealth's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by First Claim Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by First Claim Defendants, but not disclosed in public statements by First Claim Defendants during the Class Period, Plaintiff and the other

17

members of the Class purchased Commonwealth's common stock during the Class Period at artificially high prices, and were damaged thereby.

76.      At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Commonwealth's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Commonwealth securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

77.      By virtue of the foregoing, First Claim Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

78.      As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

79.      This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## SECOND CLAIM
### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants and Audit Committee Defendants

80.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81.      This claim is asserted against the Individual Defendants and Audit Committee Defendants (the "Second Claim Defendants").

18

82.     The Second Claim Defendants acted as controlling persons of Commonwealth within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Second Claim Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading. The Second Claim Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

83.     In particular, each of these Second Claim Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

84.     As set forth above, Commonwealth and the Second Claim Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

85.     By virtue of their positions as controlling persons, the Second Claim Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

19

86. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 4, 2013

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Steven J. Toll (Va. Bar No. 15300)
Daniel S. Sommers
S. Douglas Bunch
Elizabeth Aniskevich (Va. Bar No. 81809)
1100 New York Ave., N.W.
Suite 500, West Tower
Washington, DC 20005-3965
Phone: (202) 408-4600
Fax: (202) 408-4699
Email: stoll@cohenmilstein.com
      dsommers@cohenmilstein.com
      dbunch@cohenmilstein.com
      eaniskevich@cohenmilstein.com

*Liaison Counsel for Plaintiff*

-and-

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
Phillip Kim, Esq.
275 Madison Avenue, 34th Floor
New York, NY 10016
Phone: (212) 686-1060
Fax: (212) 202-3827

*Attorneys for Plaintiff*

21